1

2

3

4

5

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9                **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11    RHONDA TIMMONS,                      No. CIV S-06-2609-CMK

12              Plaintiff,

13        vs.                              <u>MEMORANDUM OPINION AND ORDER</u>

14    COMMISSIONER OF SOCIAL
      SECURITY,
15
                Defendant.
16
      _____/
17

18              Plaintiff, who is proceeding with retained counsel, brings this action for judicial

19    review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

20    Pursuant to the consent of the parties, this case is before the undersigned for final decision on

21    plaintiff's motion for summary judgment (Doc. 19) and defendant's cross-motion for summary

22    judgment (Doc. 20).

23    / / /

24    / / /

25    / / /

26    / / /

# I. BACKGROUND

Plaintiff challenges the cessation of benefits pursuant to a continuing disability review.  Plaintiff applied for social security benefits on August 26, 1993, and on September 15, 1993.  In her applications, plaintiff claims that disability began on April 1, 1992.  In a disability report submitted on September 3, 1993, plaintiff claims her disability consists of:  "mutilation, domestic violence stab victim, anorexia, beleamic [sic], emotional problems, depression."  Plaintiff is a United States citizen born November 24, 1961, with an eleventh-grade education.

## A.  **Procedural History**

Plaintiff was initially determined to be disabled and was granted benefits.  This determination was confirmed in a March 10, 1994, decision.  Following a first continuing disability review in March 1997, it was determined that plaintiff's condition had improved and that she was no longer disabled.  Plaintiff sought reconsideration of that determination and a disability hearing was held on August 12, 1997.  On August 27, 1997, the agency issued a decision granting reconsideration and determining that plaintiff was still disabled.  In that decision, the hearing officer recited the following background:

> In 1993, beneficiary was using both alcohol and methamphetamines. Beneficiary has a long history of treatment for destructive behavior.  At the time of the [March 10, 1994, decision], she was experiencing panic attacks, depression, and problems with bulimia.  She also has a history of anorexia nervosa and was being treated at a battered women's facility on a weekly basis.  A past employer reported that she often had conflicts with other people, was distracted.  She was terminated as she was unable to persist or keep the pace required. . . .
>
> Currently, beneficiary has been clean and sober for several years.  She was hospitalized three times in 1996 because of paranoia, irrational fears, confusion, and eating disorder.  She continues to have an eating disorder, paranoia, depression, and panic attacks.  She is not suicidal and she has no cognitive problems.  In addition, she experiences severe headaches and generalized body pain which affects her concentration.  The etiology of these headaches and pain is not yet known.  Beneficiary has difficulty coping and completing normal activities of daily living. . . .

After a second continuing disability review, it was determined in February 2000 that plaintiff remained disabled because her condition had not improved since the 1997 decision.

A third continuing disability review was conducted in December 2003.  This review concluded that plaintiff was no longer disabled because of improvement.  Plaintiff appealed that determination and a hearing was held on June 8, 2004.  On June 9, 2004, the agency issued a decision affirming the December 2003 determination, concluding that plaintiff was no longer disabled because her condition has improved as of November 2003.  In the June 9, 2004, decision, the hearing officer provided the following procedural summary:

> Ms. Timmons is a 42-year-old woman who was initially found disabled in a State Agency decision of 3/10/94 due to mental problems.  Disability was established as of 3/1/93 based on medical and vocational factors.  In a continuing disability review decision dated 2/3/00, it was determined that the beneficiary's condition has not significantly improved.  This decision represents the comparison point decision (CPD) for purposes of the current review.

The hearing officer described plaintiff's condition at the time of the February 2000 CPD as follows:

> Ms Timmons has a history of mental problems including depression, paranoia, eating disorders, and substance [abuse] dating back many years.  She was hospitalized three times in 1996.  She also has displayed symptoms of a destructive disorder and has been fired due to conflicts with other people and her inability to keep up with the work lead.  In 1/00, she spoke in a pressured, rambling, and loose manner.  Her mood was expansive and she admitted to hearing voices.  She was depressed and anxious, but was not suffering from suicidal or homicidal ideation.  These findings were supported by evidence submitted by Sutter-Yuba Mental Health, on 1/19/00.
>
> * * *
>
> . . . At the time of the CPD, she admitted to hearing voices and was depressed and anxious.  She also was suffering from an eating disorder.

Contrasting plaintiff's condition as of the February 2000 CPD, the hearing officer described plaintiff's condition as of the December 2003 determination as follows:

> Currently, the beneficiary continues to be treated for mental problems and has complaints of depression and anxiety.  She is dressed casually and groomed neatly.  Her mood is dysphoric, her affect is irritable, and her speech is of normal volume and rate.  She is not suffering from suicidal ideation or auditory hallucinations.  She reports to still have trouble dealing with people and can become defensive easily.  These findings are supported by evidence submitted by Sutter-Yuba Mental Health, on

3

12/9/03.

> At the hearing, the beneficiary was cheerful, cooperative, and forthright in all answers she provided except when discussing her substance abuse. She did not walk with a limp and did not appear depressed or anxious. She was able to answer . . . all questions without hesitation.

> An evaluation of the total evidence establishes that the beneficiary has experienced significant improvement in her mental status. She also was suffering from an eating disorder. Currently, she states she no longer suffers from delusions or auditory hallucinations. Her eating disorder has also been cured. . . . In comparing the beneficiary's current mental status with that present at the CPD, a finding for medical improvement can reasonably be established.

Plaintiff sought reconsideration. A hearing was held on May 18, 2005, at which time plaintiff waived her right to representation and appeared pro se. Also appearing at the hearing was plaintiff's mother, Sally Timmons. In his May 23, 2005, decision, Administrative Law Judge ("ALJ") Antonio Acevedo-Torres offered the following background statement concerning the 2004 cessation of benefits determination:

> In a Continuing Disability Review (CDR) decision, dated June 9, 2004, it was held that disability benefits were properly ceased on November 1, 2003, as the claimant's medical condition had significantly improved since the time of the Comparison Point Decision (CPD) of March 10, 1994. This finding was supported by mental health evidence showing that she was no longer experiencing delusions or auditory hallucinations, her eating disorder had been cured, neither anxiety nor depression were evident upon examination, her mood was cooperative and cheerful, speech was unremarkable, grooming and appearance were adequate, suicidal and homicidal ideations were not present, and her answers to questions were forthright. She walked without a limp and was thereby found to be capable of performing medium work. Hence, it was concluded that given the claimant's residual functional capacity and vocational factors, she was no longer disabled under vocational rule 203.25 of table No. 3 as contained in Appendix 2 of the Social Security regulations.

The ALJ made the following findings:

> 1.    The claimant was found to be disabled and eligible for supplemental security income under Title XVI and disability insurance benefits under Title II as of March 1, 1993;

> 2.    The claimant has not performed substantial gainful activity since March 1, 1993;

3.  Pursuant to a Continuing Disability review (CDR) decision dated June 9, 2004, it was determined that the claimant's disability ceased effective November 1, 2003;

4.  The record as a whole supports a finding that there has been medical improvement in the claimant's condition since March 10, 1994, the Comparison Point Decision (CPD);

5.  The claimant's medical improvement is related to her ability to work;

6.  The claimant's testimony is not substantially credible . . .;

7.  The claimant is severely impaired as a result of an old right knee injury, chronic anxiety, and depression; the claimant does not have a severe substance abuse disorder;

8.  The claimant no longer has an impairment or a combination of impairments which either meets or equals any listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1;

9.  Since November 1, 2003, the date that the claimant's disability benefits were ceased, she has had the exertional residual functional capacity to perform light work; her exertional limitations preclude her from frequently lifting more than 10 pounds and occasionally lifting more than 20 pounds; her ability to work since this date has also been eroded by a limitation to frequently socially interact with the public;

10.  The claimant does not have any past relevant work that she could perform;

11.  The claimant is a 43-year-old younger age individual who has a high school education and no work experience;

12.  The claimant does not have any acquired work skills which are transferable to the unskilled or semiskilled work functions of other work;

13.  Because the claimant has the ability to perform light work with a non-exertional mental impairment related limitation, rule 202.17 of table No. 2, Appendix 2, Subpart P, Regulations No. 16, indicates that a finding of not disabled would be appropriate within the framework of this rule; and

15.  The claimant's disability was properly ceased on November 1, 2003.

Based on these findings, the ALJ concluded that plaintiff was no longer disabled and, therefore, not entitled to continuation of benefits. Plaintiff sought review by the Appeals Council. In its November 6, 2006, decision denying review, the Appeals Council noted:

> In looking at your case, we considered the reasons you disagree with the decision. Your representative contended that the Administrative Law Judge used the wrong comparison point date. However, insofar as there

1   was no medical improvement at your later continuing disability reviews,
2   medical improvement since March 1994 presumes that there has also been
    medical improvement since those later reviews. . . .

3   **B.      Summary of Relevant Evidence**

4           Because this is a cessation of benefits case where the primary issue is whether

5   plaintiff's medical condition improved with respect to her ability to work, the court need only

6   focus on the evidence relevant to this issue.  Specifically, as discussed above, plaintiff's

7   condition in February 2000 – the date of the most recent favorable disability determination – is

8   the starting point.  It is undisputed that plaintiff was disabled at that time due to her mental

9   impairments.  The question is whether her condition improved after that date and, if so, whether

10  that improvement related to her ability to work.

11          For dates after February 2000, plaintiff offers the following background:

12              . . . In late 2003 (by which time Ms. Timmons was past her second
        cessation review), [treating physician ] Dr. Yang carried [sic] Ms.
13      Timmons as suffering bipolar disorder, with a GAF of 57/58.  (Transc., p.
        573).  As of then, she took Paxil and Risperdal.  (Transc., p. 572).  The
14      earliest reference to bipolar disorder may be 2002, the first time Dr.
        Yang's handwriting appears (Transc., p. 584), but these treating records
15      rarely give diagnoses, she acted manic while admitting both anxiety and
        depression in early 2000 (Transc., p. 585), and as will be seen her
16      medication list *evolved* more than it changed since . . . 1998's
        prescriptions.  In 2004, Dr. Yang's diagnosis was bipolar disorder, rule-out
17      schizoaffective disorder.  (Transc., p. 762).  Per a recommendation of Ms.
        Timmons' OB/GYN, he switched her from Risperdal to Geodon.  (Transc.,
18      pp. 762-763).  As of March 2005, Ms. Timmons was taking Paxil,
        Geodon, Neurotonin, Abilify, plus Ambien for sleep (so that, if medication
19      lists determined disability, she would appear worse than she had been at
        any point).  (Transc., p. 768).
20

21  From this, it appears that plaintiff asserts the following timeline would summarize her medical

22  condition after February 2000:

23  Early 2000          Plaintiff acted manic and complained of anxiety and
                        depression.
24
    2002                First appearance of diagnosis of bipolar disorder by Dr.
25                      Yang.

26  / / /

| Late 2003 | Dr. Yang diagnosed bipolar disorder and assigns a GAF of 57/58; plaintiff was taking Paxil and Risperdal. |
| 2004 | Dr. Yang diagnosed bipolar disorder, rule-out schizoaffective disorder; medications changed. |
| 2005 | Plaintiff was taking Paxil, Geodon, Neurotonin, Abilify, plus Ambien for sleep. |

A large portion of the certified administrative record ("CAR") consists of medical records from before 2000 and is not relevant to this case.  The relevant medical documents are: (1) records from Sutter Health Clinic covering the period from January 6, 1995, through January 20, 2004 (CAR 455-557); (2) records from Sutter Yuba Mental Health covering the period from September 2, 1983, through January 20, 2004 (CAR 566-689); (3) psychiatric evaluation by agency examining psychiatrist Timothy Canty, M.D., dated October 30, 2003 (CAR 432-35); (4) mental residual functional capacity assessment and psychiatric review technique form dated November 6, 2003 (CAR 438-54); (5) physical residual functional capacity assessment dated December 15, 2003 (CAR 558-65); (6) medical records from Sutter Health Clinic covering the period from August 19, 2003, through May 20, 2004 (CAR 732-57); (7) medical records from Sutter Yuba Mental Health covering the period from March 10, 2004, through July 27, 2004 (CAR 758-67); (8) mental residual functional capacity assessment and psychiatric review technique form dated April 15, 2004 (CAR 692-709); (9) physical residual functional capacity assessment dated April 19, 2004 (CAR 712-19); (10) medical records from Dr. Yang dated March 21, 2005 (CAR 768); and (11) letter from Dr. Yang dated April 5, 2005 (CAR 769).

    1. <u>Sutter Health Clinic</u>

Treatment notes by Dr. Yang from April 2002 reflect that plaintiff reported:  "I have accomplished a lot since I saw you last."  Plaintiff also reported that she was "going for a diploma" and that she was happy and felt more positive.  She reported that she was eating well and not restricting intake.  Dr. Yang noted bipolar disorder under "Plan/Comment."  (CAR 584). In May 2002, plaintiff reported to Dr. Yang that "everything is going well."  She also told Dr.

1   Yang that she wanted to have a child.  While Dr. Yang continued to note bipolar disorder, he also

2   observed that plaintiff was dressed well, pleasant, and had good speech.  (CAR 583).  In October

3   2002, plaintiff reported that she was not feeling well, but that she was doing well in school and

4   that concentration was good.  (CAR 581).  Between July 2002 and October 2003, Dr. Yang

5   altered the doses of plaintiff's psychiatric medications.  (CAR 582).

6          By January 2003, plaintiff reported that her mood was worse and she was not

7   doing as well in school.  (CAR 588).  In February and April 2003, plaintiff reported that she was

8   "still working 5 days/wk.," and was still attending school.  Plaintiff reported that her mood and

9   energy were good.  She was also discussing the possibility of getting pregnant.  (CAR 578-79).

10  By May 2003, plaintiff had moved into her own apartment and was living on her own.  She

11  reported her mood was very stable.  Dr. Yang noted "very good improvement" and ruled out

12  schizoaffective disorder.  (CAR 577).  Notes from June 25, 2003, indicate that plaintiff was a

13  little depressed because she lost her job, but that she was still living on her own.  Plaintiff's sleep

14  was fine and she was eating well.  Dr. Yang suggested that plaintiff attend vocational

15  rehabilitation.  (CAR 576).  In July 2003, plaintiff reported that, because some days she doesn't

16  feel well, she takes extra Paxil tablets.  So, she requested an increase in dosage, which Dr. Yang

17  approved.  (CAR 575).  In November 2003, plaintiff reported to Dr. Yang that her disability

18  benefits were going to be discontinued and asked if there was anything he could do to help.

19  (CAR 570).  In December 2003, plaintiff reported to Dr. Yang that she felt "everything is coming

20  down" on her.  Dr. Yang encouraged plaintiff to appeal the social security denial and continue to

21  look for a job.  However, he also stated that he helped plaintiff summarize the reasons she can't

22  keep a job, such as trouble dealing with people and becoming defensive.  (CAR 569).

23          In January 2004, plaintiff reported that she had found a job, but that she needed

24  surgery for her right knee due to a bicycle accident.  She also reported to Dr. Yang that she was

25  crying a lot, felt resentful towards her boyfriend, but that her sleep was good.  Dr. Yang observed

26  no paranoia.  (CAR 567).

2. <u>Sutter Yuba Mental Health</u>

These documents appear to be duplicates of Dr. Yang's treatment notes.

3. <u>October 30, 2003, Psychiatric Evaluation</u>

Agency consulting physician Timothy Canty reported on his psychiatric examination of plaintiff on October 30, 2003.  Plaintiff reported to Dr. Canty that her chief complaint was:  "I have anorexia and schizophrenia."  She also reported that she was living by herself, attending school, but had recently lost her full-time janitorial job at PRIDE Industries. Plaintiff suggested that she might be re-hired after a six-month hiatus.  She recently turned down a job offer due to lack of transportation and told Dr. Canty that she supports herself on social security benefits.  Plaintiff also reported that she does her own chores, handles her own finances, enjoys outdoor activities, watches television, and socializes well with family and friends.

Dr. Canty reported the following objective findings upon conducting a mental status examination:  (1) plaintiff was well-groomed and arrived on time; (2) her speech was clear and she was cooperative; (3) her logic was clear and goal-oriented; and (4) she was in a good mood.  As to intellectual functioning, Dr. Canty observed good results across the board.  Dr. Canty expressed the following opinion:

> . . . Her symptoms are well controlled by her medications.  She is followed closely by mental health and as long as she is in compliance with her medications, she will likely remain stable.  She is currently actively seeking employment and could be able to work as soon as a job is offered to her. . . . [¶] She is fully functional from a psychiatric standpoint. . . .

4. <u>November 6, 2003, Mental Residual Functional Capacity Assessment</u>

This assessment was performed by agency physician E. Harrison.  Dr. Harrison noted no significant limitations in any category of mental functioning.  He concluded that "she has significantly medically improved. . . ."  As to restrictions of activities of daily living, difficulties in maintaining social functioning, and difficulties maintaining concentration, persistence, or pace, Dr. Harrison noted only mild limitations.  He noted one or two episodes of decompensation.

5.   December 15, 2003, Physical Residual Functional Capacity Assessment

An agency physician noted no limitations in any category.

6.   April 15, 2004, Mental Residual Functional Capacity Assessment

The agency physician noted no significant limitations in any category except moderate limitations in plaintiff's ability to understand and remember detailed instructions, carry out detailed instructions, and accept instructions and respond appropriately to criticism.  The physician also noted moderate limitation in plaintiff's ability to maintain social functioning.

7.   April 19, 2004, Physical Residual Functional Capacity Assessment

By this time, plaintiff had injured her knee.  The agency physician noted some limitations associated with this injury.  Specifically, plaintiff could occasionally lift and carry up to 20 pounds, frequently lift and carry up to ten pounds, stand and/or walk at least two hours in an eight-hour workday, sit about six hours in an eight-hour workday, and was limited in pushing and pulling with her lower extremities.  He also noted that plaintiff could only occasionally climb, balance, stoop, kneel, crouch, or crawl.

8.   March and April 2005 Medical Records from Dr. Yang

A prescription signed by Dr. Yang on March 2, 2005, indicates that plaintiff was taking Paxil, Geodon, Neurotonin, Abilify, and Ambien for sleep.  In an April 5, 2005, letter, Dr. Yang offered the following opinion:

> As Rhonda's treating physician, I am writing this letter at her request to assist her Social Security Disability review.  [¶] It is my opinion that Rhonda is not ready to enter a full-time work force at this time, even though she may appear to be symptom-free.  Because she is deficient in work skills and social skills, when she is placed in a work-related environment, her emergent psychopathology becomes evidence.  At her last job, she had trouble getting along with her supervisor and co-workers and had very low tolerance for stress.  She was overwhelmed by anxiety and paranoia.  Her attempt at sustaining her work triggered a relapse of her paranoia and depression.  Without further job training and social skill training, the expectation of her succeeding at work would be unrealistic.

///

///

10

## II.  STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence.  See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).  Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

## III.  DISCUSSION

In her motion for summary judgment, plaintiff argues:  (1) the ALJ used the wrong comparison point decision date and made other procedural errors; (2) the ALJ failed to give proper weight to the April 5, 2005, opinion of plaintiff's treating physician, Dr. Yang; (3) the ALJ erred in determining that plaintiff's testimony was not credible; (4) the ALJ failed to consider the lay witness testimony from plaintiff's mother; (5) the ALJ's residual functional capacity determination lacks explanation; and (6) the ALJ erred in not obtaining vocational

1    expert evidence.

2        **A.    Procedural Errors**

3            Plaintiff assigns the following procedural errors:  (1) the ALJ erred by using the

4    March 10, 1994, decision as the comparison point decision for purposes of his continuing

5    disability analysis; (2) the ALJ failed to provide any rationale regarding the applicability of the

6    Listing of Impairments at the second step of the sequential analysis; (3) the decision conflates

7    steps three and four of the sequential analysis; (4) the decision contains no rationale to support

8    the severity finding.  Defendant only responds to the first of these arguments in his cross-motion.

9            1.    Comparison Point Decision Date

10           The comparison point decision – CPD – for purposes of a continuing disability

11   review is the most recent favorable medical determination.  See 20 C.F.R. § 404.1594(b)(1); SSR

12   05-03p.  Plaintiff argues that, by referencing the March 10, 1994, determination, the ALJ erred

13   because the most recent favorable determination was in February 2000.  As the Appeals Council

14   noted, plaintiff is correct that the ALJ's decision erroneously states that the March 1994 decision

15   is the relevant CPD.  In fact, the March 1994 decision is the CPD with respect to March 1997

16   cessation of benefits decision, which was ultimately reversed in August 1997.  The relevant CPD

17   for purposes of the cessation determinations at issue in this case is the February 2000

18   determination.

19           The court, however, agrees with defendant that this error was clerical and

20   harmless.  The Ninth Circuit has applied harmless error analysis in social security cases in a

21   number of contexts.  For example, in Stout v. Commissioner of Social Security, 454 F.3d 1050

22   (9th Cir. 2006), the court stated that the ALJ's failure to consider uncontradicted lay witness

23   testimony could only be considered harmless ". . . if no reasonable ALJ, when fully crediting the

24   testimony, could have reached a different disability determination."  Id. at 1056.  Similarly, in

25   Batson v. Commissioner of Social Security, 359 F.3d 1190 (9th Cir. 2004), the court applied

26   harmless error analysis to the ALJ's failure to properly credit the claimant's testimony.

1 Specifically, the court held:

2  However, in light of all the other reasons given by the ALJ for
3 Batson's lack of credibility and his residual functional capacity, and in
light of the objective medical evidence on which the ALJ relied there was
substantial evidence supporting the ALJ's decision. Any error the ALJ
4 may have committed in assuming that Batson was sitting while watching
television, to the extent that this bore on an assessment of ability to work,
5 was in our view harmless and does not negate the validity of the ALJ's
ultimate conclusion that Batson's testimony was not credible.

6   Id. at 1197 (citing Curry v. Sullivan, 925 F.2d 1127, 1131 (9th Cir. 1990)).

7

8 In Curry, the Ninth Circuit applied the harmless error rule to the ALJ's error with respect to the

9 claimant's age and education.

10   In this case, it is clear that the ALJ described plaintiff's condition as of the

11 appropriate CPD of February 2000 in conducting his analysis. Specifically, the ALJ described

12 plaintiff's condition in the same way the hearing officer did in the June 2004 decision and it is

13 not disputed that the June decision is based on the correct CPD. It appears that the clerical error

14 in the ALJ's decision resulted because the March 1994 decision was the CPD relevant to the

15 earlier cessation determination in 1997. Notwithstanding the confusion in dates, the ALJ's

16 decision properly considered plaintiff's condition as of the most recent favorable decision date –

17 February 2000 – in determining that her condition had improved. The clerical error does not

18 affect the substance of the ALJ's analysis.

19   Furthermore, as the Appeals Council observed, even if the ALJ had based his

20 decision on the starting point of March 1994, the evidence shows that there was nonetheless

21 medical improvement by the date of the ALJ's decision in 2005. In other words, if there was

22 improvement by the time of the ALJ's 2005 decision as measured from March 1994, there must

23 also have been improvement as measured from February 2000.

24 ///

25 ///

26 ///

2.      Listings Analysis

Plaintiff argues:

> It can reasonably be said that [the ALJ's] decision not only looks to the wrong comparison point decision at the third step [of the sequential analysis], but had already gone awry by failing to perform a listing analysis at step two.  Although the Findings section purported to make one, . . . the body of the decision contains none.  Decisions must be made, and explained, in the rationale section.  Raw conclusions in the Findings section alone do not meet legal requirements.

Plaintiff cites 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), SSR 85-28, Flake v. Gardner, 399 F.2d 532 (9th Cir. 1968), and Pinto v. Massanari, 249 F.3d 840 (9th Cir. 2001), in support of this argument.  In this case, the ALJ stated at Finding No. 8 that "[t]he claimant no longer has an impairment or a combination of impairments which either meets or equals any listed impairment in the [Listing of Impairments]."

The Social Security Regulations "Listing of Impairments," which is typically considered at step three of the sequential analysis, is comprised of impairments to fifteen categories of body systems that are severe enough to preclude a person from performing gainful activity.  Young v. Sullivan, 911 F.2d 180, 183-84 (9th Cir. 1990); 20 C.F.R. § 404.1520(d).  Conditions described in the listings are considered so severe that they are irrebuttably presumed disabling.  20 C.F.R. § 404.1520(d).  In meeting or equaling a listing, all the requirements of that listing must be met.  Key v. Heckler, 754 F.2d 1545, 1550 (9th Cir. 1985).  This step-three determination is made only if the claimant actually has an impairment which is determined at step two to be severe.  Here, the ALJ found at Finding No. 7 that plaintiff ". . . is severely impaired as a result of an old knee injury, chronic anxiety, and depression" but that plaintiff does not have a severe substance abuse disorder.  The decision, however, provides no rationale to support Finding No. 8 regarding the Listings.

/ / /

/ / /

/ / /

14

1          The court, however, concludes that any omission of a rationale to support Finding

2    No. 8 is harmless in light of the record as a whole.  The medical evidence is clear that plaintiff's

3    medical condition improved significantly by the time of the ALJ's decision.  Before February

4    2000, plaintiff was described as having depression, eating disorders, and substance abuse

5    problems.  She also displayed symptoms of a destructive disorder and had been fired from a job

6    she held prior to 1994 due to conflicts with other people and her inability to keep up with the

7    work load.  In 1996, plaintiff had been hospitalized three separate times due to her mental

8    problems.  In January 2000, she spoke in a pressured, rambling, and loose manner.  Her mood

9    was expansive and she admitted to hearing voices.  However, as demonstrated by the Sutter

10   Health Clinic records from 2000 on, plaintiff's eating disorder was gone, her mood was good, her

11   speech was good, and she had been able to hold down a full-time janitorial job at PRIDE

12   Industries.  She was also confident enough with her social skills to look for other jobs and

13   potentially be re-hired by PRIDE Industries.  Thus, even had the ALJ provided a rationale

14   supporting his Listings conclusion at Finding No. 8, no reasonable ALJ would have reached a

15   different disability conclusion in this case.  There is no possibility that, given plaintiff's

16   improvement, her remaining mental impairment met or equaled any listed impairment.

17          The court also concludes that neither of the cases cited by plaintiff direct a

18   different result.  In Flake, the court held that, even if the result reached by the ALJ is supported

19   by substantial evidence, it should nonetheless be set aside if the ALJ applied the wrong legal

20   standard.  See 399 F.2d at 540.  In that case, the legal standard at issue had been amended since

21   the date of the ALJ's decision under review.  See id.  By contrast, there is no claim in this case

22   that the ALJ applied the wrong standard.  Rather, the claim is simply that the ALJ did not

23   provide a rationale to support his Listings conclusion.  In Pinto, the court stated that the ALJ is

24   required to make the "requisite factual findings to support his conclusion."  249 F.3d at 844.  In

25   this case, the ALJ did make factual determinations to support Finding No. 8 that the Listings did

26   not apply.

1          3.        Analysis at Steps Three and Four

2          Next, plaintiff argues that the ALJ's analysis conflates steps three and four of the

3    sequential evaluation process. Specifically, plaintiff argues:

4                    . . . The decision offers up a hodge-podge of historical facts,
              claimant statements, upbeat out-takes from chart notes, and ultimate

5             medical findings.  Either it does not identify the narrow medical findings
              that would properly support a step three medical findings, or it in effect

6             asks this court to prise out of a rambling paragraph on page 26 of the
              transcript those items that *would* support a proper step three finding.  Flake

7             v. Gardner . . . and Pinto v. Massanari preclude the court from doing so.
              Similarly, "medical improvement not related to ability to do work" and

8             "medical improvement that is related to ability to do work" are also
              defined, technical terms . . .; this rambling paragraph does not fit its

9             hodge-podge of facts into these categories; and this court cannot substitute
              a more proper ordering or reading of these facts.

10

11          At step three of the sequential evaluation process applicable in cessation cases, the

12   question is whether there has been medical improvement since the CPD.  Medical improvement

13   is defined as "any decrease in the medical severity of impairment(s) present at the time of the

14   most recent favorable medical decision . . . and is determined by a comparison of prior and

15   current medical evidence which must show that there have been changes (improvement) in the

16   symptoms, signs, or laboratory findings. . . ."  See 20 C.F.R. § 404.1594(c)(1) and (f).  If there

17   has been medical improvement, the question at step four is whether such improvement is related

18   to the ability to work.  See 20 C.F.R. § 404.1594(c)(2) and (f).

19          The court finds that the ALJ's decision properly conducts analyses of both steps.

20   In particular, the paragraph at page 26 of the transcript that plaintiff complains about contains the

21   ALJ's analysis supporting his conclusion that plaintiff's medical condition has improved.  In this

22   paragraph, which is admittedly very long, the ALJ details the evidence of record supporting a

23   finding of medical improvement.  He also states as to various pieces of evidence how the change

24   in condition relates to plaintiff's ability to work, thereby performing the required step four

25   analysis.

26   / / /

1      For example, the ALJ relates various facts demonstrating that plaintiff does not

2  have any current psychiatric symptoms and notes a psychiatric assessment from Dr. Canty:

3           . . . This coincides with a consultative psychiatric assessment from Dr.
            Timothy Canty, M.D., dated October 30, 2003, which held that given the
4           claimant's normal mental status examination, well controlled psychotic
            disorder while on medications, and GAF of 85, she does not have any
5           nonexertional functional limitations.

6  This discussion demonstrates how the ALJ first set forth the evidence to make a step-three

7  determination of improvement and then the evidence – Dr. Canty's opinion – that her

8  improvement relates to her ability to work.  It is not necessary for the court to "prise" anything

9  out of the ALJ's decision.  There is nothing in the cases cited by plaintiff which precludes an

10 ALJ from combining steps three and four in the way the ALJ did in this case particularly where,

11 as here, the ALJ made specific findings and provided rationale as to each step such that this court

12 can conduct meaningful review.  See e.g. Pinto, 249 F.3d at 847.

13     Further, any possible error with respect to application of the sequential analysis

14 was harmless because the medical evidence supports the ALJ's finding that plaintiff's medical

15 condition improved and that the improvement related to her ability to work.  As to Dr. Canty's

16 GAF rating of 85 in late 2003, the court finds that Dr. Yang's assessment at about the same time

17 that plaintiff's GAF was as lows as 57 is not supported by plaintiff's activities of going to school,

18 holding down a full-time job at PRIDE Industries, living on her own, and maintaining her own

19 finances.  No reasonable ALJ would have found that plaintiff's disability had not ended, even

20 had the analyses at steps three and four been performed exactly as plaintiff suggests.

21          4.      Severity Finding

22     Finally, plaintiff assigns procedural error based on the contention that the ALJ's

23 decision contains no rationale to support a severity finding.  Here, at Finding No. 7, the ALJ

24 concluded that plaintiff currently has severe impairments, both physical and mental.  As with

25 Finding No. 8 regarding the Listing of Impairments, there is no rationale to support this

26 determination.  It appears that this was also a clerical error with the word "not" being omitted

1   from the finding.  A finding that plaintiff had no severe impairments is consistent with the body

2   of the ALJ's decision and the medical evidence as a whole.  Furthermore, this error is completely

3   harmless because it is clear from the medical evidence that plaintiff's mental impairment had

4   improved and was not severe by any stretch of the imagination.  Similarly, any physical

5   impairment associated with her knee injury was not severe, as demonstrated by both physical

6   residual functional capacity assessments.

7         **B.**    **Evaluation of Medical Opinions**

8         The weight given to medical opinions depends in part on whether they are

9   proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d

10  821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating

11  professional, who has a greater opportunity to know and observe the patient as an individual,

12  than the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285

13  (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given

14  to the opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4

15  (9th Cir. 1990).

16        In addition to considering its source, to evaluate whether the Commissioner

17  properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are

18  in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an

19  uncontradicted opinion of a treating or examining medical professional only for "clear and

20  convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831.

21  While a treating professional's opinion generally is accorded superior weight, if it is contradicted

22  by an examining professional's opinion which is supported by different independent clinical

23  findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035,

24  1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be

25  rejected only for "specific and legitimate" reasons supported by substantial evidence.  See Lester,

26  81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of

1    the facts and conflicting clinical evidence, states his interpretation of the evidence, and makes a

2    finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and

3    legitimate reasons, the Commissioner must defer to the opinion of a treating or examining

4    professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining professional,

5    without other evidence, is insufficient to reject the opinion of a treating or examining

6    professional.  See id. at 831.  In any event, the Commissioner need not give weight to any

7    conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111,

8    1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion);

9    see also Magallanes, 881 F.2d at 751.

10                  In this case, plaintiff argues that the ALJ erred in rejecting the opinions of her

11   treating physician, Dr. Chunlin Yang, M.D., as expressed in his April 5, 2005, letter.  As to Dr.

12   Yang, the ALJ stated:

13                  The record also contains an April 5, 2005, letter from Dr. Chunlin Yang,
                    M.D., which opined that the claimant could not work full-time due to her
14                  depression and anxiety.  However, the undersigned finds that this brief,
                    conclusory, one-paragraph letter is not credible as:  (1) The doctor's
15                  attached chart notes consistently documenting  mental health improvement
                    with very scant objective clinical findings of a mental impairment; (2) The
16                  doctor acknowledges in his letter that the claimant appears symptom free;
                    (3) The doctor's assessment appears to be based upon the claimant's self-
17                  serving subjective statements; (4) The doctor's assessment is at odds with
                    the fact that she is working and attending school; (5) The doctor's
18                  assessment is refuted by the more thorough consultative psychiatric
                    assessment from Dr. Canty.  As such, the undersigned does not accord this
19                  assessment any weight.

20   The court finds that the ALJ provided numerous specific and legitimate reasons for rejecting Dr.

21   Yang's opinion that plaintiff could not perform full-time work.  As to plaintiff's argument that

22   the reasons provided by the ALJ are "inaccurate, debatable, or unacceptable," where there are

23   conflicts in the record, the ALJ may resolve those conflicts.  See Andrews, 53 F.3d at 1041.

24   ///

25   ///

26   ///

1    Dr. Canty's opinion does indeed provide a source of contradictory clinical

2  findings.  Specifically, Dr. Canty observed:  (1) plaintiff was well-groomed; (2) speech was clear;

3  (3) plaintiff's thought processes were logical and goal-oriented; (4) her mood was good; and

4  (5) her intellectual functioning was good.  These objective findings certainly contradict Dr.

5  Yang's opinion that plaintiff could not perform full-time work.  It is not required, as plaintiff

6  suggests, that Dr. Canty's findings be contrary to Dr. Yang's <u>findings</u>.  What is required is that

7  there be findings which contradict the treating physician's <u>opinion</u>.  See <u>id.</u>

8    Further, as the ALJ noted in his decision, Dr. Yang's own notes clearly show that

9  plaintiff's condition had improved.  Her mood is consistently described as good, with very few

10 exceptions which were related to specific events and not chronic.  Plaintiff has been able to hold

11 down a full-time job and attend school.  She was even considering having a child.

12    Finally, the court agrees with the ALJ that it appears the April 5, 2005, letter was

13 based on the doctor's desire to help plaintiff avoid cessation of social security benefits and not on

14 clinical findings.  Specifically, in December 2003, Dr. Yang encouraged plaintiff to continue to

15 look for a job but, at the same time, helped plaintiff summarize the reasons she can't keep a job.

16 Apparently, Dr. Yang's opinion as to whether plaintiff could work depended on whether her

17 benefits would continue.  The law requires the opposite – benefits only continue if the claimant

18 cannot work.

19    **C.    Credibility Determination**

20    The Commissioner determines whether a disability applicant is credible, and the

21 court defers to the Commissioner's discretion if the Commissioner used the proper process and

22 provided proper reasons.  See <u>Saelee v. Chater</u>, 94 F.3d 520, 522 (9th Cir. 1995).  An explicit

23 credibility finding must be supported by specific, cogent reasons.  See <u>Rashad v. Sullivan</u>, 903

24 F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See <u>Lester v. Chater</u>, 81 F.3d

25 821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible

26 and what evidence undermines the testimony.  See <u>id.</u>  Moreover, unless there is affirmative

1    evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not

2    credible must be "clear and convincing."  See id.

3             If there is objective medical evidence of an underlying impairment, the

4    Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely

5    because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d

6    341, 347-48 (9th Cir. 1991) (en banc).  The Commissioner may, however, consider the nature of

7    the symptoms alleged, including aggravating factors, medication, treatment, and functional

8    restrictions.  See id. at 345-47.  In weighing credibility, the Commissioner may also consider:

9    (1) the claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent

10    testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a

11    prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5)

12    physician and third-party testimony about the nature, severity, and effect of symptoms.  See

13    Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996) (citations omitted).

14             The ALJ summarized plaintiff's testimony as follows:

15        The claimant testified that she cannot work . . . due to depression and
anxiety with a resulting fear of being around people.  She stated that she

16        visits her treating physician monthly and has been prescribed three
different types of psychiatric medications.  She further stated, however,

17        that she does not have any physical problems.

18    As to plaintiff's credibility, the ALJ stated:

19        . . . [T]he claimant's wide-ranging activities of daily living are inconsistent
with a disabling impairment as she has been working for Burger King for

20        the last two months, four hours a day, five days per week, washes dishes,
sleeps well, does the laundry and housework, and is able to maintain her

21        own appearance.

22    A review of the hearing transcript reflects that plaintiff testified that she cannot work at all due to

23    anxiety and being fearful of people.  However, as the ALJ noted, this is inconsistent with her

24    testimony that she has a part-time job at Burger King and plans to return to college, both of

25    which involve interacting with people.  Therefore, the court concludes that the ALJ properly

26    rejected plaintiff's claim that she cannot work as not credible.

1       **D.**     <u>**Lay Witness Testimony**</u>

2        In determining whether a claimant is disabled, an ALJ generally must consider lay

3 witness testimony concerning a claimant's ability to work.  <u>See</u> <u>Dodrill v. Shalala</u>, 12 F.3d 915,

4 919 (9th Cir. 1993); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e).  Indeed, "lay

5 testimony as to a claimant's symptoms or how an impairment affects ability to work is competent

6 evidence . . . and therefore cannot be disregarded without comment."  <u>See</u> <u>Nguyen v. Chater</u>, 100

7 F.3d 1462, 1467 (9th Cir. 1996).  Consequently, "[i]f the ALJ wishes to discount the testimony

8 of lay witnesses, he must give reasons that are germane to each witness."  <u>Dodrill</u>, 12 F.3d at

9 919.

10        The ALJ, however, need not discuss all evidence presented.  <u>See</u> <u>Vincent on</u>

11 <u>Behalf of Vincent v. Heckler</u>, 739 F.2d 1393, 1394-95 (9th Cir. 1984).  Rather, he must explain

12 why "significant probative evidence has been rejected."  <u>Id.</u> (citing <u>Cotter v. Harris</u>, 642 F.2d 700,

13 706 (3d Cir.1981).  Applying this standard, the court held that the ALJ properly ignored evidence

14 which was neither significant nor probative.  <u>See</u> <u>id.</u> at 1395.  As to a letter from a treating

15 psychiatrist, the court reasoned that, because the ALJ must explain why he rejected

16 uncontroverted medical evidence, the ALJ did not err in ignoring the doctor's letter which was

17 controverted by other medical evidence considered in the decision.  <u>See</u> <u>id.</u>  As to lay witness

18 testimony concerning the plaintiff's mental functioning as a result of a second stroke, the court

19 concluded that the evidence was properly ignored because it "conflicted with the available

20 medical evidence" assessing the plaintiff's mental capacity.  <u>Id.</u>

21        In <u>Stout</u>, the Ninth Circuit recently considered an ALJ's silent disregard of lay

22 witness testimony.  <u>See</u> 454 F.3d at 1053-54.  The lay witness had testified about the plaintiff's

23 "inability to deal with the demands of work" due to alleged back pain and mental impairments.

24 <u>Id.</u>  The witnesses, who were former co-workers testified about the plaintiff's frustration with

25 simple tasks and uncommon need for supervision.  <u>See</u> <u>id.</u>  Noting that the lay witness testimony

26 in question was "consistent with medical evidence," the court in <u>Stout</u> concluded that the "ALJ

1  was required to consider and comment upon the uncontradicted lay testimony, as it concerned

2  how Stout's impairments impact his ability to work." Id. at 1053.   The Commissioner conceded

3  that the ALJ's silent disregard of the lay testimony contravened Ninth Circuit case law and the

4  controlling regulations, and the Ninth Circuit rejected the Commissioner's request that the error

5  be disregarded as harmless.  See id. at 1054-55.  The court concluded:

6               Because the ALJ failed to provide any reasons for rejecting competent lay
               testimony, and because we conclude that error was not harmless,
7               substantial evidence does not support the Commissioner's decision . . .

8               Id. at 1056-67.

9               From this case law, the court concludes that the rule for lay witness testimony

10  depends on whether the testimony in question is controverted or consistent with the medical

11  evidence.  If it is controverted, then the ALJ does not err by ignoring it.  See Vincent, 739 F.2d at

12  1395.  If, however, lay witness testimony is consistent with the medical evidence, then the ALJ

13  must consider and comment upon it.  See Stout, 454 F.3d at 1053.  However, the

14  Commissioner's regulations require the ALJ consider lay witness testimony in certain types of

15  cases.  See Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996); SSR 88-13.  That ruling

16  requires the ALJ to consider third-party lay witness evidence where the plaintiff alleges pain or

17  other symptoms that are not shown by the medical evidence.  See id.  Thus, in cases where the

18  plaintiff alleges impairments, such as chronic fatigue or pain (which by their very nature do not

19  always produce clinical medical evidence), it is impossible for the court to conclude that lay

20  witness evidence concerning the plaintiff's abilities is necessarily controverted such that it may

21  be properly ignored.  Therefore, in these types of cases, the ALJ is required by the regulations

22  and case law to consider lay witness evidence.

23               In this case, the ALJ summarized plaintiff's mother's testimony as follows:

24               The claimant's mother also testified that her daughter cannot work due to
               anxiety with panic attacks and has had to leave work due to aggravation of
25               her condition.

26  The ALJ did not, however, discuss this testimony beyond providing this brief summary.  Citing

23

1   Vincent, defendant argues there is no error because the testimony conflicts with the medical

2   evidence.  The court agrees.  Specifically, Dr. Canty's observations as well as Dr. Yang's

3   treatment notes, all outlined above, conflict with plaintiff's mother's testimony.

4           **E.      Residual Functional Capacity Determination**

5           Residual functional capacity is what a person "can still do despite [the

6   individual's] limitations."  20 C.F.R. §§ 404.1545(a), 416.945(a) (2003); see also Valencia v.

7   Heckler, 751 F.2d 1082, 1085 (9th Cir. 1985) (residual functional capacity reflects current

8   "physical and mental capabilities").  In determining residual functional capacity, the ALJ must

9   assess what the plaintiff can still do in light of both physical and mental limitations.  See 20

10  C.F.R. §§ 404.1545(a), 416.945(a) (2003); see also Valencia v. Heckler, 751 F.2d 1082, 1085

11  (9th Cir. 1985) (residual functional capacity reflects current "physical and mental capabilities").

12  Where there is a colorable claim of mental impairment, the regulations require the ALJ to follow

13  a special procedure.  See 20 C.F.R. §§ 404.1520a(a), 416.920a(a).  The ALJ is required to record

14  pertinent findings and rate the degree of functional loss.  See 20 C.F.R. §§ 404.1520a(b),

15  416.920a(b).

16          Plaintiff argues that the ALJ's analysis of plaintiff's current residual functional

17  capacity is inadequate.  Here, the ALJ stated that plaintiff's "non-exertional residual functional

18  capacity since November 1, 2003, has been compromised only to the extent that she is incapable

19  of frequently socially interacting with the public."  He also stated that she has the exertional

20  residual functional capacity to perform light work.  As to plaintiff's non-exertional residual

21  functional capacity in light of her colorable claim of mental problems, the court agrees with

22  plaintiff that the ALJ's analysis is too cursory.  Specifically, the ALJ did not make the specific

23  findings outlined in the regulations.  See e.g. 20 C.F.R. § 404.1520a(c).  However, any error is

24  harmless.  It is clear based on the two mental residual functional capacity assessments that the

25  findings required by the regulations were in fact made.  That the ALJ did not recite these findings

26  in his decision does not render the ultimate disability determination incorrect.  The fact remains

1  that the record contains the required findings and supports the conclusion that plaintiff's

2  disability ceased.

3     **F.     Vocational Expert Testimony**

4            The Medical-Vocational Guidelines ("Grids") provide a uniform conclusion about

5  disability for various combinations of age, education, previous work experience, and residual

6  functional capacity.  The Grids allow the Commissioner to streamline the administrative process

7  and encourage uniform treatment of claims based on the number of jobs in the national economy

8  for any given category of residual functioning capacity.  See Heckler v. Campbell, 461 U.S. 458,

9  460-62 (1983) (discussing creation and purpose of the Grids).

10            The Commissioner may apply the Grids in lieu of taking the testimony of a

11  vocational expert only when the grids accurately and completely describe the claimant's abilities

12  and limitations.  See Jones v. Heckler, 760 F.2d 993, 998 (9th Cir. 1985); see also Heckler v.

13  Campbell, 461 U.S. 458, 462 n.5 (1983).  Thus, the Commissioner generally may not rely on the

14  Grids if a claimant suffers from non-exertional limitations because the Grids are based on

15  strength factors only.  See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(b).  "If a

16  claimant has an impairment that limits his or her ability to work without directly affecting his or

17  her strength, the claimant is said to have non-exertional . . . limitations that are not covered by

18  the Grids."  Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir. 1993) (citing 20 C.F.R., Part 404,

19  Subpart P, Appendix 2, § 200.00(d), (e)).  The Commissioner may, however, rely on the Grids

20  even when a claimant has combined exertional and non-exertional limitations, if non-exertional

21  limitations do not impact the claimant's exertional capabilities.  See Bates v. Sullivan, 894 F.2d

22  1059, 1063 (9th Cir. 1990); Polny v. Bowen, 864 F.2d 661, 663-64 (9th Cir. 1988).

23            In cases where the Grids are not fully applicable, the ALJ may meet his burden

24  under step five of the sequential analysis by propounding to a vocational expert hypothetical

25  questions based on medical assumptions, supported by substantial evidence, that reflect all the

26  plaintiff's limitations.  See Roberts v. Shalala, 66 F.3d 179, 184 (9th Cir. 1995).  Specifically,

1  where the Grids are inapplicable because plaintiff has sufficient non-exertional limitations, the

2  ALJ is required to obtain vocational expert testimony.  See Burkhart v. Bowen, 587 F.2d 1335,

3  1341 (9th Cir. 1988).

4          In this case, the ALJ identified non-exertional limitations, specifically plaintiff's

5  inability to interact with the public frequently.  However, as defendant argues, this limitation

6  does not affect plaintiff's ability to perform exertional activities of sitting, standing, walking,

7  lifting, carrying, pushing, or pulling.  Therefore, vocational testimony was not necessary.

8

9                          **IV.  CONCLUSION**

10         Based on the foregoing, the court concludes that the Commissioner's final

11  decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY

12  ORDERED that:

13         1.      Plaintiff's motion for summary judgment is denied;

14         2.      Defendant's cross-motion for summary judgment is granted; and

15         3.      The Clerk of the Court is directed to enter judgment and close this file.

16

17

18  DATED:  February 4, 2008

19

20                                         _____
                                           **CRAIG M. KELLISON**
                                           UNITED STATES MAGISTRATE JUDGE

21

22

23

24

25

26